UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CAMERON LUNDQUIST, an individual, and LEEANA LARA, an individual, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>       v.<br><br>FIRST NATIONAL INSURANCE COMPANY OF AMERICA, a New Hampshire Corporation, and LM GENERAL INSURANCE COMPANY, an Illinois Corporation, and CCC INFORMATION SERVICES INCORPORATED, a Delaware Corporation,<br><br>                    Defendants. | CASE NO. 18-5301 RJB<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST |

THIS MATTER comes before the Court on the Defendant CCC Information Services Inc.'s ("CCC") Motion for Summary Judgment on the Claims of Plaintiff Leeana Lara (Dkt. 174) and CCC's Motion for Summary Judgment on the Claims of Cameron Lundquist (Dkt. 190, filed

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 1

in redacted form at Dkt. 189).  The Court has considered the pleadings filed regarding the motions, the remaining file, and heard oral argument on 30 October 2020.

In this putative class action, the Plaintiffs assert that Defendants' practice of using unexplained, unitemized, and unjustified condition adjustments to comparable vehicles when valuing a total loss claim for a vehicle, violates the Washington Administrative Code ("WAC"), specifically WAC 284-30-391 (4)(b) and (5)(d).  Dkt. 90.  They make claims for: (1) breach of contract against First National Insurance Company of America ("First National" or "Liberty") and LM General Insurance Company ("LM General" or "Liberty"), (Liberty Mutual ("Liberty") is the parent company of both First National and LM General), (2) breach of the implied covenant of good faith and fair dealing against Liberty, (3) violation of Washington's Consumer Protection Act, RCW 19.86., *et seq*. ("CPA"), against all Defendants, and (4) civil conspiracy against all Defendants. Dkt. 90.  The Plaintiffs seek damages, declaratory and injunctive relief, attorneys' fees and costs.  *Id.*

In the pending motions, the Defendant CCC moves for summary judgment on all of the named Plaintiffs' claims asserted against CCC.  Dkts. 174, 189, and 190.  For the reasons provided below, the motions (Dkts. 174, 189, and 190) should be denied.

**I.     FACTS AND PROCEDURAL HISTORY**

In Washington, a motor vehicle is a "total loss" when "the cost of parts and labor, plus the salvage value, meets or exceeds . . . the 'actual cash value' of the loss vehicle."  Washington Administrative Code ("WAC") 284-30-320 (15).  The "actual cash value," in turn, is defined as the "fair market value of the loss vehicle immediately prior to the loss."  WAC 284-30-320 (1).  The dispute here revolves around the determination of the "fair market value of the loss vehicle." In order to fully understand the events surrounding the named Plaintiffs' claims, a brief review of

Washington insurance law on "total loss" vehicles, and how "comparable motor vehicles" are used to determine the value of the loss, is helpful.

## A. RELEVANT STATUTORY AND REGULATORY BACKGROUND

The Washington legislature has found that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW § 48.01.030. To that end, it authorized the Washington Insurance Commissioner to promulgate regulations which define unfair or deceptive methods, acts, and practices in the business of insurance. RCW 48.30.010.

Three such regulations are relevant here. WAC 284-30-391 (2) provides, an "insurer may settle a total loss claim by offering a cash settlement based on the actual cash value of a comparable motor vehicle, less any applicable deductible provided for in the policy." WAC 284-30-320 (3) provides:

> "Comparable motor vehicle" means a vehicle that is the same make and model, of the same or newer model year, similar body style, with similar options and mileage as the loss vehicle and in similar overall condition, as established by current data. To achieve comparability, deductions or additions for options, mileage or condition may be made if they are itemized and appropriate in dollar amount.

WAC 284-30-391 (4)(b) provides: "[w]hen settling a total loss claim . . . the insurer must . . . [b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage, or condition when determining comparability."

It is the failure to itemize condition adjustments that is at the heart of Plaintiffs' claims.

## B. LIBERTY'S USE OF DEFENDANT CCC'S VALUATION REPORTS GENERALLY

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 3

1    Liberty Mutual ("Liberty"), the parent company of the insurance companies that insured
2    both named Plaintiffs (LM General insured Lara and First National insured Lundquist),
3    contracted with CCC to report on the estimated value of total loss vehicles for claims against LM
4    General and First National.  Dkts. 96 and 103.  (Both Plaintiffs' policies provide that Liberty
5    "will pay for direct and accident loss to your covered auto."  Dkts. 177-2 and 191-1.)  CCC
6    produces a report, which it gives to Liberty; CCC bases its opinion of the loss vehicle's value on
7    the value of comparable vehicles sold by dealers in the area of the loss vehicle.  Dkt. 103.  CCC
8    reduces the value of these comparable vehicles, using a "condition adjustment," to a "normal
9    wear condition."  *e.g*. Dkts. 177-4.  It is this "condition adjustment" that the Plaintiffs assert is
10   unexplained, unitemized, unjustified, and contrary to Washington law; it is the basis for their
11   proposed class action.  Dkt. 90.  The Second Amended Complaint states that the case is brought
12   on behalf of "all those insured under automobile insurance policies issued in the State of
13   Washington by [First National] or [LM General]" and proposes to define the class as:

> All individuals insured by First National and [LM General] under a private passenger vehicle policy who, from the earliest allowable time to the date of judgment, received a first-party total loss settlement or settlement offer based in whole or in part on the price of comparable vehicles reduced by a "condition adjustment."

Dkt. 90, at 12. The proposed class in this case has not yet been certified.  The factual circumstances of each individually named Plaintiff follows.

**C. PLAINTIFF LARA**

Plaintiff Lara purchased a 2015 black Dodge Charger with 20,311 miles for $22,175 (excluding taxes, fees and services) on February 26, 2016.  Dkt. 177-1, at 2.  She insured the vehicle with LM General/Liberty.  Dkt. 177-2.  Most of the evidence in the record regarding Plaintiff Lara refers to LM General as Liberty and this order will do so as well.  In any event,

1  after the vehicle was involved in an accident, Plaintiff Lara made a claim with Liberty for total
2  loss on February 3, 2017.  Dkt. 177-3.  Liberty, in turn, sought a valuation report from CCC,
3  which was produced that same day.  Dkt. 177-4.

4  CCC's report lists Plaintiff Lara's vehicle's value as $17,224.00 at the time of loss.  Dkt.
5  177-4. The report indicates that the value of the vehicle was based on the loss vehicle's condition
6  and two comparable vehicles available, or recently sold by, dealerships within 127 miles of the
7  loss vehicle's home.  *Id.,* at 8.  CCC's report reviews the loss vehicle's equipment, twelve
8  components of the loss vehicle's condition (e.g. seats, carpets, exterior paint, and tires) based on
9  a Liberty adjuster's report, and gave her loss vehicle an upward adjustment of $529 for the
10 "dealer ready" condition of items like the exterior paint, trim, glass, and dashboard.  Dkt. 177-4.
11 The report then reviews comparable vehicles.  Dkt. 177-4.  In its assessment of the two
12 comparable vehicles, CCC's report subtracts $842 from their value for "condition adjustments,"
13 which the report explains "sets the comparable vehicle to normal wear condition, which the loss
14 vehicle is also compared to in the vehicle condition section."  *Id.,* at 8-9.  No further explanation
15 for "condition adjustments" is in the report.

16 According to Plaintiff Lara, fairly shortly after the accident occurred, around February 6,
17 2017, she spoke with Liberty who told her that the value of her loss vehicle "was around $19,000
18 and some, not including taxes and fees," maybe as much as $19,900.  Dkt. 177-10, at 10-19.

19 On February 8, 2017, Liberty offered to settle her total loss claim for $18,460.18,
20 reflecting the loss vehicle's "actual cash value" of $17,224.00, plus taxes and fees and less her
21 deductible.  Dkt. 177-11, at 3.  That offer was based on CCC's valuation report, but Plaintiff
22 Lara was not sent the report at that time.  *See generally, Id.;* Dkt. 177-10, at 10-19.  The Plaintiff
23 rejected the offer, asserting that the cash value of her vehicle was around $19,000.  Dkt. 177-12,
24

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA
AND CAMERON LUNDQUIST - 5

at 2.  She asked how the actual cash value of her loss vehicle was being determined.  *Id.*  Plaintiff Lara also disputed the amount of the deductible and asserted that her towing bill should be "reimbursed immediately."  *Id.*

Over the next few weeks, Plaintiff Lara and Liberty negotiated.  *See e.g.* Dkt. 177-13. Eventually, on February 17, 2017, Liberty "invoked" a provision in the parties' contract which provided for an independent appraisal.  Dkt. 177-14, at 2.  Later, Liberty suggested that Lara invoke the appraisal provision (on May 26, May 29, and June 5 of 2017).  It is unclear whether the parties proceeded under the appraisal provision.

On May 22, 2017, Darrell Harber, the public adjuster Plaintiff Lara hired, provided a valuation of her loss vehicle of $23,308.00; Liberty's third-party appraiser's valuation (provided around May 26, 2017) was $19,800.00 for the loss vehicle.  Dkts. 177-17 and 177-18.  The record does not indicate that an umpire was ever appointed (as provided in the appraisal clause of the policy when the parties do not agree on valuation). No agreement under the appraisal clause was ever finalized.

Ultimately, Liberty sent Plaintiff Lara a check using CCC's valuation of the loss vehicle of $17,244, which was adjusted by an unitemized condition adjustment of -$592 to the comparable vehicles.  Plaintiff Lara cashed the check.  Dkt. 177-19, at 6.  The Plaintiff testified that she didn't remember specifically contesting CCC's condition adjustment to the comparable vehicles.  Dkt. 177-10, at 5.

### D.  PLAINTIFF LUNDQUIST

Plaintiff Lundquist was the owner of a 1998 Dodge Ram 2500 Quad cab truck which he says he kept in immaculate condition.  Dkt. 205-12, at 3-15.  He insured it with First National, whose parent company is Liberty.  Dkt. 191-1. (The documents in the record regarding Plaintiff

Lundquist refer to First National though, so to minimize confusion, this opinion will use First National.)  The policy also contained a provision to determine the actual cash value of a loss vehicle if the parties disagree on the amount of the loss:

> If we and you do not agree on the amount of loss, either party may demand an appraisal of the loss.  In this event, each party will select an appraiser.  The two appraisers will select an umpire.  The appraisers will state separately the actual case value and amount of loss.  If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

*Id.,* at 40.

On December 4, 2017, the truck was stolen, flipped over, and destroyed.  Dkt. 205-16. On December 5, 2017, Plaintiff Lundquist made a claim with First National for the total loss. Dkt. 191-3.

First National obtained a valuation report from CCC on Plaintiff Lundquist's loss vehicle. Dkt. 25-2.  It listed the vehicle's "adjusted value," before taxes and fees were added or the deductible subtracted, as $16,840.00. *Id.* The "Comparable Vehicles" portion of the report lists three comparable trucks: 1998 Dodge Ram 2500 Quad Cab with 127,664 miles, a 1999 Dodge Ram 2500 Quad Cab with 130,017 miles, and a 1999 Dodge Ram 3500 Quad Cab with 201,150 miles; each listed for sale with car dealers. Dkt. 25-2, at 9-10. This section of the report contains a line "Condition," that reduces the value of all three comparable vehicles by $936. Dkt. 25-2, at 9-10. This line includes a footnote that provides: "[t]he Condition Adjustment sets that comparable vehicle to Normal Wear condition which the loss vehicle is also compared to in the Vehicle Condition Section." Dkt. 25-2, at 10. In the "Vehicle Condition" portion of the report, Plaintiff's truck was given an upward adjustment as being in "dealer ready" condition for the dashboard and engine (in the amount of $51 each, for a total of $102) and was listed as "normal wear" for the other conditions. *Id*., at 8. A note on the side of this page states:

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 7

> First National Insurance Company of America uses condition inspection guidelines to determine the condition of key components of the loss vehicle prior to the loss. The guidelines describe physical characteristics for these key components, for the condition selected based upon age. Inspection Notes reflect observations from the appraiser regarding the loss vehicle's condition.
>
> CCC makes dollar adjustments that reflect the impact the reported condition has on the value of the loss vehicle as compared to Normal Wear condition. These dollar adjustments are based upon interviews with dealerships across the United States.

*Id.*

On December 12, 2017, First National sent Plaintiff Lundquist an offer of $17,470, if First National retained the loss vehicle, or $16,820, if Plaintiff Lundquist kept it. Dkt. 191-9, at 2. The offer indicates that First National used CCC's valuation's estimate and listed the "actual cash value" of the loss vehicle at $16,840, which included the unitemized "condition" adjustment to the comparable vehicles of -$936. *Id.* On December 13, 2017, Plaintiff Lundquist accepted the offer and opted to keep the loss vehicle. Dkt. 191-10.

On April 18, 2018, Plaintiff Lundquist filed this case. Dkt. 1. Other efforts to settle the claim followed, without success.

On November 5, 2018, First National sent Plaintiff Lundquist an additional check for $5,093.38 for the difference between the original payment and the appraisers' valuation. Dkt. 191-17. Plaintiff Lundquist did not accept the check. Dkt. 191-14.

## II.   DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 8

showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. WASHINGTON SUBSTANTIVE LAW APPLIES**

Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity jurisdiction, as is the case here, apply state substantive law and federal procedural law.

1  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  In applying Washington

2  law, the Court must apply the law as it believes the Washington Supreme Court would apply it.

3  *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

4  "'[W]here there is no convincing evidence that the state supreme court would decide differently,

5  a federal court is obligated to follow the decisions of the state's intermediate appellate courts.'"

6  *Vestar Dev. II, LLC v. Gen. Dynamics Corp.,* 249 F.3d 958, 960 (9th Cir.2001) (*quoting Lewis v.*

7  *Tel. Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir.1996)).

**C. CPA CLAIM**

Washington's CPA was enacted to protect the public from "unfair or deceptive acts or practices in the conduct of any trade or commerce."  *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc*., 162 Wn.2d 59, 73, 170 P.3d 10, 17 (2007)(*quoting* RCW 19.86.020).  The CPA is to "be liberally construed that its beneficial purposes may be served." *Thornell v. Seattle Serv. Bureau, Inc*., 184 Wn.2d 793, 799 (2015)(*quoting* RCW 19.86.920).

To make a CPA claim, "a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*., 105 Wash.2d 778, 780 (1986); *Keodalah v. Allstate Insurance Co.,* 194 Wash.2d 349, 349-350 (2019).

In the motions for summary judgment, CCC argues that Plaintiffs Lara and Lundquist cannot point to issues of fact on the fourth and fifth elements – they cannot show that they suffered an injury or that the condition adjustments in CCC's valuation report caused their injuries.  Dkts. 174, 189 and 190.

  1. <u>Injury</u>

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 10

"The CPA's citizen suit provision states that '[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 37 (2009)(*quoting* RCW 19.86.090).

There are issues of fact whether the Plaintiffs were injured by CCC. The "Actual Cash Value" that Liberty was to pay Plaintiff Lara and Plaintiff Lundquist under their policies is determined by the valuation procedure in Washington law, which was incorporated into the Plaintiffs' policies. The procedure was violated when CCC applied the unitemized condition adjustments to the comparable vehicles. Plaintiffs have pointed to issues of fact that those adjustments were used to reduce their claims, injuring Plaintiffs Lara and Lundquist. How damages will be determined in not yet before the Court. CCC's assertions as to the individual Plaintiffs follows.

*a.  Plaintiff Lara*

CCC argues that Plaintiff Lara cannot show she was injured because during its negotiations, Liberty upwardly adjusted the value of the vehicle to $19,800, abandoning the CCC valuation. Dkts. 174 and 213. Further, CCC maintains that Plaintiff Lara cannot "revive her injury claim" because she did not accept the higher offer – and so did not mitigate her damages. *Id.*

Contrary to CCC's assertions, there are issues of fact as to whether Plaintiff Lara was injured by CCC's valuation. Although she attempted to negotiate a different result, in the end, Plaintiff Lara received payment based on CCC's valuation. Plaintiff Lara's decision not to accept an offer she still felt was flawed doesn't change the fact that she was injured. Further, she incurred expenses in her investigation of the valuation of her loss which are cognizable injuries. *See*

1  *Peoples v. United Servs. Auto. Ass'n,* 194 Wn.2d 771, 782 (2019)("expenses incurred to
2  investigate a deceptive act or practice are cognizable injuries and damages under the CPA").

3             *b.  Plaintiff Lundquist*

4   CCC argues that Plaintiff Lundquist cannot show that he was injured for purposes of the
5  CPA because a binding appraisal took place, that was independent from CCC's valuation, and
6  First National paid Plaintiff Lundquist the full actual cash value as determined by the appraisal
7  process.  Dkts. 190 and 212.

8   Plaintiff Lundquist has shown sufficient issues of fact as to whether he was injured by CCC's
9  valuation.  The appraisal-based offer on Plaintiff Lundquist's loss was not made until after he
10 filed this case.  The offer does not change his position from the time he filed suit.  Moreover, he
11 did not accept the offer.  "An unaccepted settlement offer—like any unaccepted contract offer—
12 is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's
13 rejection of an offer leaves the matter as if no offer had ever been made."  *Campbell-Ewald Co.*
14 *v. Gomez*, 136 S. Ct. 663, 670 (2016)(*internal quotation marks and citations omitted*).  Further,
15 Plaintiff Lundquist points out that the settlement offer does not resolve additional damages
16 related to the delay, his underlying legal claims or requested monetary, declaratory and
17 injunctive relief.

18                An Observation

19  Furthermore, it seems counter-intuitive to deprive Plaintiffs of the required itemization of
20 condition adjustments, and then to argue that they have not been damaged.  Under such
21 circumstances, the basic information necessary to prove damages lies in the hands of Defendants.
22 If Defendant CCC properly itemized the condition adjustment, the insured would then have the

23

24

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 12

information necessary to accept or reject the Defendants' offer, and to argue for a specific amount of damages, if appropriate.

### 2. Causation

CCC next argues that neither Plaintiff can show that its actions were the proximate cause of their injuries; that the Plaintiffs cannot demonstrate CCC is the legal cause or the but for cause of their injuries. Under the CPA, a plaintiff must demonstrate that "the deceptive act or practice proximately caused injury to the plaintiff's business or property." *Panag,* at 63-64. Both prongs of proximate cause, legal cause and but for cause, are considered below.

### 3. Legal Cause

"The focus in the legal causation analysis is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability" and is an issue of law. *Michaels v. CH2M Hill, Inc*., 171 Wn.2d 587, 611 (2011). "A determination of legal liability will depend upon mixed considerations of logic, common sense, justice, policy, and precedent." *Id.*

The Plaintiffs have sufficiently shown that CCC's valuations were a legal cause of their losses. CCC applied the unexplained and unitemized adjustment to the valuations of the Plaintiffs' loss vehicles. The Plaintiffs were paid, or final offers were made, based on those valuations. CCC assertions, that the events in both these Plaintiffs' situations was unforeseeable, lack merit. Litigation and disputes over the value of losses is commonplace.

### 4. But For Cause

A plaintiff must show that "but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Indoor Billboard,* at 83. The existence of proximate causation is ultimately a question for the trier of fact. *Id.*

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS LEEANA LARA AND CAMERON LUNDQUIST - 13

a. *Plaintiff Lara*

CCC maintains that Plaintiff Lara cannot show that CCC was the but for cause of her injury because she had no knowledge of the CCC valuation or condition equating adjustment while she was negotiating with Liberty or before she rejected Liberty's offers.  It also asserts that she can't establish that she would have acted differently had it not been for CCC's valuation.

Plaintiff Lara has pointed to sufficient issues of fact, which if believed, demonstrate that CCC's valuation was the but for cause of her injury.  Contrary to CCC's assertions, "[t]o establish injury and causation in a CPA claim, it is not necessary to prove one was actually deceived." *Panag*, at 63.  CCC's citation to cases in which the plaintiffs brought CPA claims based on advertisements do not apply.  Plaintiff Lara disputed Liberty's valuation of the vehicle, which was based on CCC's valuation and which had, as a component, an unitemized condition adjustment.

b. *Plaintiff Lundquist*

Likewise, Plaintiff Lundquist has demonstrated that there are issues of fact as to whether CCC's valuation was the but for cause of his injury.  Plaintiff Lundquist filed this case in response to the use of CCC's valuation report to pay less on his claim than he believed it was worth.  Defendants' later attempts to repair the damage by invoking the appraisal provision well after the litigation began does not change the fact that CCC's valuation causing of him damage.

**D. CONSPIRACY CLAIMS AND DECLARATORY AND INJUNCTIVE RELIEF CLAIMS**

The Plaintiffs' conspiracy claims and declaratory and injunctive relief claims are derivative of the Plaintiffs' CPA claim against CCC.  There are issues of fact as to their CPA claim.  Accordingly, the motion to dismiss the conspiracy claim should be denied.

**E. CONCLUSION**

CCC's motions for summary judgment should be denied. There are several genuine issues of material fact for trial.

### III. ORDER

It is **ORDERED** that:

- Defendant CCC Information Services Inc.'s Motion for Summary Judgment on the Claims of Plaintiff Leeana Lara (Dkt. 174) **IS DENIED**; and

- Defendant CCC Information Services Inc.'s Motion for Summary Judgment on the Claims of Cameron Lundquist (Dkt. 190, filed in redacted form at Dkt. 189) **IS DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 1st day of October, 2020.

*/s/ Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge